# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

White Rose Credit Union,  :
                  Petitioner  :
  :
      v.  : No. 694 C.D. 2019
  : SUBMITTED: November 8, 2019
Unemployment Compensation Board  :
of Review,  :
                  Respondent  :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: January 6, 2020

White Rose Credit Union (Employer) petitions for review of the May 7, 2019 Order of the Unemployment Compensation Board of Review (Board) reversing the decision of a Referee to deny Jennifer F. Swanner (Claimant) unemployment compensation (UC) benefits. The Board concluded that Claimant was eligible for UC benefits under Section 402(e) of the Unemployment Compensation Law (Law)[1] because Employer failed to prove that she was discharged for willful misconduct. We affirm the Board's Order.

## Background

Claimant worked full time as Vice President of Marketing for Employer from August 23, 2011 through August 30, 2018. Bd.'s Finding of Fact (F.F.) No. 1;

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which his [or her] unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his [or her] work." 43 P.S. § 802(e).

Record (R.) Item No. 3. Employer has a policy that prohibits its employees from making false statements about Employer, its employees, or its members. Bd.'s F.F. No. 2. Employer also has a policy that provides for an employee's discharge if the employee demonstrates unsatisfactory work performance. *Id.* No. 3. Claimant was aware of Employer's policies. *Id.* Nos. 2, 3.

On August 21, 2018, Claimant and one of her subordinates, Robert Ford, were expected to represent Employer at a marketing event at Central Market in York, Pennsylvania, from approximately 11:00 a.m. until 2:00 p.m. *Id.* No. 4; Notes of Testimony (N.T.), 10/22/18, at 10, 13. Claimant and Mr. Ford arrived at Central Market that day at 11:30 a.m., but the outside event had been cancelled due to light rain. Bd.'s F.F. No. 5. Claimant networked with patrons inside the market and handed out promotional items displaying Employer's logo. *Id.* Around 12:00 p.m., Claimant gave Mr. Ford a lunch break. *Id.* No. 6; N.T., 10/22/18, at 11, 13. Claimant also took a lunch break at that time and walked to a food vendor just outside of the market. Bd.'s F.F. No. 6. Claimant returned to Central Market around 1:00 p.m. and continued to network with patrons and vendors inside the market until 2:00 p.m. *Id.* Claimant left promotional materials inside the market before she left the premises for the day. *Id.*

Three other employees of Employer went to Central Market that day for lunch, arriving around 11:50 a.m. and leaving around 1:00 p.m. *Id.* No. 7. These employees did not see Claimant or Mr. Ford while they were at Central Market. *Id.* No. 8.

Later that day, Employer's Vice President of Human Resources, Tamika Baker, overheard Claimant describing the Central Market event to another co-worker as "busy" and stating that Claimant handed out Employer's promotional

materials at the market. *Id.* No. 9; N.T., 10/23/18, at 2, 6. Ms. Baker was one of the three employees who had gone to Central Market for lunch. Bd.'s F.F. No. 9. Ms. Baker had concerns about Claimant's integrity after overhearing this conversation. *Id.* No. 10.

On August 30, 2018, Ms. Baker and Employer's Chief Executive Officer, Debra Kauffman, met with Claimant regarding her representation to another co-worker that she was at Central Market on August 21, 2018. *Id.* No. 11; N.T., 10/22/18, at 7-8. Claimant told them that she was present at Central Market that day. Bd.'s F.F. No. 11; *see* N.T., 10/22/18, at 8 (Claimant testified that she "absolutely was present at the [Central Market] event").

Employer offered Claimant an opportunity to resign in lieu of discharge. Bd.'s F.F. No. 12. Employer initiated the termination due to Claimant's violation of its policies prohibiting unsatisfactory work performance and false statements and Claimant's failure to maintain integrity. *Id.*

Claimant filed a claim for UC benefits, which the local UC Service Center denied. The Service Center noted that the record contained conflicting evidence regarding whether Claimant voluntarily quit or was discharged from her employment; however, the Service Center ultimately found that Claimant voluntarily quit because she "initiated the separation" from employment. Not. of Determination, 9/27/18, at 1. The Service Center found that "although the Claimant had a necessitous and compelling reason for quitting, . . . [she] did not exhaust all alternatives prior to quitting." *Id.* Therefore, the Service Center determined that Claimant was ineligible for UC benefits under Section 402(b) of the Law.[2] *Id.*

---

[2] Section 402(b) of the Law provides that an employee shall be ineligible for UC benefits for any week "[i]n which his [or her] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature." 43 P.S. § 802(b).

Claimant timely appealed to the Referee, who held a hearing on October 22, 2018. At the hearing, Claimant testified that on August 21, 2018, she and Mr. Ford were scheduled to attend a lunchtime networking event known as "Box Lunch Review" at Central Market. N.T., 10/22/18, at 10. The event was organized by York City Special Events, but Employer is one of the event's sponsors. *Id.* at 9. Claimant testified that "[t]his was the second season that [Employer] had participated in this event, which happened numerous times throughout the summer." *Id.* at 8. Claimant described the nature of the event as follows:

> Typically, when the event happens outside, my staff and I would set up a table with marketing supplies and giveaways. We would spend ou[r] time just networking with the people that attend the event. It was more important for us to network versus giving items away. We also made it a priority to network with local business owners and vendors.
>
> . . . .
>
> [However,] the table was not set up [on August 21, 2018] because the event was brought inside of the market because of the weather, which was typical for that particular event[,] because it's an outdoor event. Numerous times it's been brought inside.
>
> . . . .
>
> [It] was not my call to bring the event inside [that day]. It's not our event that we put on. It's just an event that we attend.

*Id.* at 9.

Claimant testified that she and Mr. Ford arrived at Central Market at 11:30 a.m. that day and had come directly from another marketing event that ended at 11:00 a.m. *Id.* at 10-11. When they arrived at Central Market, Claimant and her staff were "exhausted" and "hungry." *Id.* at 10. Claimant testified:

4

I told my staff, if you want to go and get something to eat and take a little bit of a break; the event that we were going to be doing over the lunch hour was going to be different than what we normally do. So, I made the call to let my staff go take a break and then, I also went and took a . . . lunch break. I went and got some food from one of the vendors inside the market and then, I also went and walked to York City Pretzel, which is just outside of the market, to just do some general networking with the business owners there, as we were featuring one of them in our upcoming newsletter.

*Id.* at 11; *see id.* at 13-14. After their lunch breaks, Claimant and Mr. Ford "spent the last hour . . . networking and mingling" and "talking to a handful of different business owners that were vendors in the market." *Id.* at 11-12. Claimant further testified that she handed out newsletters and pen cards[3] bearing Employer's logo to patrons at Central Market. *Id.* at 16-17. Claimant stated, "I didn't put any [promotional materials] on the tables inside of the market. I did have a few pen cards in my hand and the very few people that were sitting and having lunch, I walked up to them and offered them a pen card." *Id.* at 17. Claimant testified that Mr. Ford did not hand out promotional materials because Claimant carried the bag containing the materials, which she brought with her when she went to York City Pretzel. *Id.* at 17-18.

After receiving Claimant's testimony, the Referee stopped the hearing and continued it to the next day so that Claimant could attend a scheduled job interview. *Id.* at 20.

---

[3] Claimant explained that "pen cards" are "little cards that have pens attached to them." N.T., 10/22/18, at 9.

Claimant did not appear at the hearing on October 23, 2018.[4] Employer presented the testimony of Ms. Baker, Ms. Kauffman, and Bryan Smith, Employer's Vice President of Lending. Mr. Smith testified that he, Ms. Baker, and Tina Shiller went to Central Market for lunch around 11:50 a.m. on August 21, 2018. N.T., 10/23/18, at 3; Bd.'s F.F. No. 7. Mr. Smith testified that the three of them walked around the market looking for a place to eat and "did not see either [Claimant or Mr. Ford], [and] didn't see any evidence of [Employer's promotional materials] at the entire event." N.T., 10/23/18, at 3. Mr. Smith testified that he "was looking for [Claimant and Mr. Ford] because we expected them to be there." *Id.* at 4.

Ms. Baker testified that she went to Central Market for lunch with Mr. Smith and Ms. Shiller that day and did not see Claimant, Mr. Ford, or any Employer literature or promotional materials inside the market. *Id.* at 4-5. When Ms. Baker returned to the office after lunch, she "overheard [Claimant] saying [to Ms. Shiller] how busy [Central Market] was, that [Claimant] handed out p[e]n cards and newsletters inside and out, and she also talked about where she ate." *Id.* at 6. Ms. Baker testified that after overhearing this conversation,

> I was very concerned. I was very shocked, because I felt that [Claimant's] integrity was in question, because we were just at that event, and we did not see [Claimant] []or [Mr. Ford]. I was concerned, because it sounded like a story. I felt that she wasn't telling the truth.

---

[4] Regarding Claimant's failure to appear, the Board found:

[C]laimant did not appear at the continued hearing because her brother with special needs had fallen at his day program. [C]laimant had to go to the hospital to fulfill the role as legal guardian because her mother was out of the state. [C]laimant requested a continuance of the hearing[, which the Referee denied].

Bd.'s F.F. No. 13; *see* N.T., 2/8/19, at 4-5.

*Id.* at 6-7. Ms. Baker believed that given Claimant's senior management position with Employer, "th[ere] was a huge problem with [Claimant's] integrity." *Id.* at 8.

Ms. Baker met with Mr. Ford and asked him whether he had attended the Box Lunch Review event, and he "stat[ed] that [he and Claimant] were there at the Box Lunch Rev[iew] that day." *Id.* at 7. Ms. Baker also met with Claimant, who "stated that [she and Mr. Ford] were present at the Box Lunch Rev[iew], [and] that they spoke to a lot of people." *Id.* at 10. Employer discharged Claimant for violating its policies prohibiting "unsatisfactory work performance" and "making false claims or statements" and for violating Employer's "core values . . . [of] integrity, . . . commitment, accountability[,] and respect." *Id.* at 15.

Following the hearings, the Referee concluded that Claimant was ineligible for UC benefits under Section 402(e) of the Law because she was discharged for willful misconduct.[5] The Referee determined:

> At the hearing, [C]laimant testified that she did not distribute [promotional] material[s] and did not provide material[s] for [Mr. Ford] to distribute. Even if the Referee would find [C]laimant's testimony credible that she was at the [Central Market] event, [C]laimant admittedly did not perform the job responsibilities she was required [to perform] by distributing material[s] at the event as she informed [E]mployer she had done. Based on the discrepancy in [C]laimant's own testimony, the Referee concludes that [C]laimant's testimony is not credible. The Referee finds [E]mployer's testimony credible that [C]laimant was untruthful regarding her activity at the event and untruthful whether or not she even attended the Central Market sponsored event [where] she was supposed to promote [E]mployer by distributing materials on behalf of the company. As such, [C]laimant's

---

[5] With regard to Claimant's eligibility for UC benefits under Section 402(b) of the Law, the Referee concluded, "[B]oth [C]laimant and [E]mployer competently testified that [C]laimant accepted [the opportunity] to submit her resignation in lieu of a discharge. Since [C]laimant's separation was not voluntary, a finding under Section 402(b) of the Law does not apply." Ref.'s Order, 10/30/18, at 3. This determination is not at issue in this appeal.

7

behavior was contrary to the standards of behavior which [E]mployer has the right to expect and [UC] benefits are denied.

Ref.'s Order, 10/30/18, at 3-4.

Claimant timely appealed to the Board, which remanded the matter to the Referee for a supplemental hearing. Specifically, the Board directed the Referee to take additional evidence on Claimant's reason for her non-appearance at the October 23, 2018 hearing, as well as additional testimony and evidence on the merits. Bd.'s Remand Order, 1/11/19, at 1.

Following the remand hearing, the Board made its own findings of fact and conclusions of law and reversed the Referee's decision. The Board concluded:

> [E]mployer presented credible evidence that it maintains a policy that prohibits making false claims or statements about [Employer], [its] employees[,] or [its] members. [E]mployer also established that [C]laimant was aware of the policy. [E]mployer presented [the] testimony of three witnesses that had gone to [Central M]arket on August 21, 2018. These witnesses testified that they did not see [C]laimant or [Mr. Ford] at the market. Thus, [E]mployer sought to prove that [C]laimant made false statements regarding her whereabouts that day through circumstantial evidence. It relied upon its witnesses' failure to see [C]laimant at the location. However, the Board accepts [C]laimant's testimony as credible that she was at the market on August 21, 2018, networking with vendors and potential customers, and that she handed out [E]mployer's [promotional] items. The Board also accepts that [Claimant] visited a vendor outside of the market while [E]mployer's witnesses were there. Further, [C]laimant left promotional materials for [E]mployer at the market after [E]mployer's witnesses had left. Therefore, the Board does not find that [C]laimant made false statements or violated [E]mployer's policies.

Bd.'s Order, 5/7/19, at 3-4. Therefore, the Board concluded that Claimant was not disqualified from receiving UC benefits under Section 402(e) of the Law. Employer now petitions for review of that decision.[6]

## Analysis

Our Court has defined "willful misconduct" as a wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior that the employer has a right to expect of its employees, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations. *Miller v. Unemployment Comp. Bd. of Review*, 83 A.3d 484, 486-87 (Pa. Cmwlth. 2014). An employer seeking to prove that a claimant committed willful misconduct by violating a work policy "must demonstrate the existence of the policy, its reasonableness, and its violation." *Klampfer v. Unemployment Comp. Bd. of Review*, 182 A.3d 495, 500 (Pa. Cmwlth. 2018). If the employer satisfies its burden of proof, then "the burden shifts to the claimant to demonstrate good cause for violating the [policy]." *Chester Cmty. Charter Sch. v. Unemployment Comp. Bd. of Review*, 138 A.3d 50, 54 (Pa. Cmwlth. 2016).

On appeal, Employer asserts that the Board capriciously disregarded uncontroverted evidence establishing that Claimant left the Box Lunch Review event while she was required to be present and working for Employer. Employer maintains that Claimant was expected to network at Central Market for the entire

---

[6] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

9

Box Lunch Review event and her failure to do so, as well her misrepresentations regarding the work she performed, violated its policies. We disagree.

Our Court has explained:

> Capricious disregard "occurs where the fact finder willfully and deliberately disregards competent and relevant evidence that one of ordinary intelligence could not possibly have avoided in reaching a result." *Wise v. Unemployment Comp[.] B[d.] of Review*, 111 A.3d 1256, 1262 (Pa. Cmwlth. 2015). More specifically, a capricious disregard of evidence occurs "where the factfinder has refused to resolve conflicts in the evidence, has not made essential credibility determinations or has completely ignored overwhelming evidence without comment." *Id.* at 1263. It is the responsibility of the factfinder to resolve the conflicts in the testimony and explain why it has accepted, or rejected, each piece of relevant evidence. *Id.*

*Bertram v. Unemployment Comp. Bd. of Review*, 206 A.3d 79, 83 (Pa. Cmwlth. 2019).

Employer contends that Claimant's testimony that she was present at Central Market on the day in question was "false in light of [Claimant's] admissions at the [h]earing" and the testimony of Employer's witnesses that they did not see Claimant "when they were present for 70 minutes at . . . Central Market." Employer's Br. at 15. However, as the Board correctly found, Employer did not discharge Claimant for falsely stating that she was present at Central Market for a specified period of time, but for falsely stating that she was present at Central Market *at all*. Bd.'s F.F. No. 11; *see* R. Item No. 5 (Employer's disciplinary record states that Claimant was discharged for her "*failure to appear at Central Market for the Box Lunch Review[,]* which was a scheduled [m]arketing event") (emphasis added). Here, Claimant credibly testified that she was working for Employer inside Central Market from 11:30 a.m. until 12:00 p.m. and again from 1:00 p.m. until 2:00 p.m. during the Box

10

Lunch Review event. Bd.'s F.F. Nos. 5, 6. Simply because Employer's witnesses did not see Claimant during their visit to Central Market that day does not render Claimant's statement false, because the record shows that Claimant and Employer's witnesses were not inside Central Market at the same time. *See* Bd.'s Order, 5/7/19, at 4 (finding that Claimant "visited a vendor outside of the market while [E]mployer's witnesses were there").

Despite its assertion on appeal that Claimant was required to be stationed inside Central Market during the entire Box Lunch Review event, Employer presented no evidence that Claimant was prohibited from taking a break during the event. Indeed, it is entirely reasonable that Claimant would take a lunch break at some point between 11:30 a.m. and 2:00 p.m., particularly where the record shows that she had come directly from working at another Employer-sponsored marketing event, which ran from 7:00 a.m. to 11:00 a.m. Claimant testified:

> We had just come from another event that morning, where we had seen approximately . . . 1,200 people. It was a very intense event. I was exhausted. My staff was exhausted. We were both hungry. Because the [Box Lunch Review] event had been changed [to] inside, it sort of goes from, you know, high profile to low profile, when the event is changed from outdoors to indoors[,] because we don't have room to set up a table.

N.T., 10/22/18, at 10; *see also id.*, Ex. E-1 (Ms. Baker's notes state that Employer's "Marketing Team ([Claimant and Mr. Ford]) had an event at Central High School on Tuesday, August 21, 2018, and there was a calendar reminder 7am-11am for [Claimant and Mr. Ford]").

Moreover, although Claimant left Central Market for one hour during the Box Lunch Review event, she credibly testified that she went to a vendor "just outside" the market and was still networking for Employer during that timeframe. Claimant

11

testified, "I walked to York City Pretzel, which is just outside of the market, *to just do some general networking with the business owners there*, as we were featuring one of them in our upcoming newsletter" and "[a]fter that, I met up with my staff, back inside the market." N.T., 10/22/18, at 11 (emphasis added). Claimant also testified that while she was at York City Pretzel, "I spoke with one of the business owners there and a few other people had come in the door, [who] were also having lunch[,] that I recognized. So, I would say it was kind of a healthy lunch *[and] also networking, which is very typical for me[] whenever I do have lunch . . . at the market*." *Id.* at 14 (emphasis added).

Furthermore, Claimant testified that Mr. Ford reported that he had also networked for Employer during his lunch break, stating that "he had talked to one of the vendors down on the other side of the market, who is a credit union member." *Id.* at 15. Claimant testified that Mr. Ford "ended up talking to . . . some business owners and things like that, *which is essentially the exact same thing that I was doing*." *Id.* at 14 (emphasis added).[7] The Board credited Claimant's testimony and found that she did, in fact, perform marketing work for Employer during the Box Lunch Review event. Bd.'s F.F. Nos. 5, 6; *see Guthrie v. Unemployment Comp. Bd. of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999) (stating that the Board is the

---

[7] Claimant explained:

> [I]t's such a casual event and we ha[ve] numerous White Rose Credit Union members [there], we always have people that want to stop us and talk to us . . . . We sort of call it our shaking hands and kissing babies networking time. [W]e have members that . . . want to ask us questions about a specific loan. They want to ask us questions about . . . their brother, sister, [or] uncle becoming a member. Or, they want to sit and tell us their life story, which is perfectly acceptable and very standard when you're doing those kinds of events.

N.T., 10/22/18, at 15.

12

ultimate factfinder in UC cases and is empowered to resolve conflicts in evidence, determine the weight to be accorded the evidence, and determine the credibility of witnesses).

Employer also contends that Claimant intentionally omitted a material fact by failing to disclose to Employer that she took a one-hour lunch break during the Box Lunch Review event. This claim, however, is belied by the record. According to Ms. Baker's notes of her conversation with Claimant about the incident, Claimant told Ms. Baker that she "spent time outside [of Central Market] visiting all [of] their regulars (the guy with the dog, the guy in the wheelchair, the daycare with kids) . . . [and] went to York City Pretzel[]." N.T., 10/22/18, Ex. E-2.

Finally, Employer argues that the Board failed to resolve the conflicts in Claimant's testimony regarding whether she distributed Employer's promotional materials inside Central Market during the Box Lunch Review event. We disagree. In its decision, the Board noted the conflicts in Claimant's testimony regarding this issue and ultimately determined that she handed out promotional materials to Box Lunch Review patrons before her lunch break and placed promotional materials on tables inside Central Market after lunch. Bd.'s F.F. No. 6. The Board observed that at the remand hearing, Claimant testified that she had placed promotional materials on tables before lunch, but the Board found that to be "a minor inconsistency" and irrelevant to the issue of whether Claimant was performing work for Employer at Central Market on the day in question. We agree with the Board. Claimant consistently testified at both hearings that she worked for Employer during the Box Lunch Review event on August 21, 2018, both by networking with patrons and vendors inside and outside Central Market and by handing out promotional materials to patrons before and after her lunch break. Claimant also continued to network with

13

nearby vendors and other patrons during her lunch break. Therefore, we conclude that the Board did not capriciously disregard competent evidence.

## Conclusion

We conclude, based on the credible evidence of record, that Employer failed to prove that Claimant violated its policies prohibiting false statements and unsatisfactory work performance. Accordingly, we affirm the Board's Order.


_____
ELLEN CEISLER, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

White Rose Credit Union,       :
            Petitioner     :
                           :
     v.                 :  No. 694 C.D. 2019
                           :
Unemployment Compensation Board :
of Review,                 :
            Respondent   :

# **O R D E R**

AND NOW, this 6th day of January, 2020, the Order of the Unemployment Compensation Board of Review, dated May 7, 2019, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge